PER CURIAM.
Emanuel Johnson appeals the ruling of the Twelfth Judicial Circuit Court denying his motion to vacate his sentence of death, filed under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the circuit court’s order.
I. BACKGROUND
Between April and June 1991, Johnson was tried, convicted, and sentenced for several crimes committed between January and October 1988 against four separate victims. Two of the victims — Iris White and Jackie McCahon — were murdered, while two — Kate Cornell and Lawanda Giddens — were not. Johnson’s convictions in the noncapital cases were used as aggravators in both capital cases, and each capital conviction was used as an aggravator in the other capital case. This appeal stems from Johnson’s first-degree murder conviction and accompanying death sentence for stabbing Iris White to death inside her home. In addition to the murder conviction, Johnson was convicted of armed burglary of White’s home.
On direct appeal, this Court set out the following facts summarizing Johnson’s crimes against White:
On October 4, 1988, police found the body of 73-year-old Iris White. She was naked from the waist down and had suffered twenty-four stab wounds, one incised wound, and blunt trauma to the back of the head. A variety of fatal wounds penetrated the lungs and heart. The body also showed evidence of defensive wounds and abrasions near the vagina and anus most likely caused by a forceful opening by hand or fingernails.
Police found a screen in the living room had been cut and the lower window raised. The fingerprints of Emanuel Johnson were recovered from the window sill. Police also found two pubic hairs that showed the same microscopic characteristics as Johnson’s, though an expert stated that an exact identification was not possible. Johnson had done yard work for White some years earlier.
After a lengthy interrogation on October 12, 1988, Johnson gave a taped confession to police. He stated that he knocked on White’s door to talk about lawn maintenance. When she opened the door, he then grabbed her, choked her to unconsciousness, and then stabbed her several times. Johnson said he then left the house, locking the door behind himself, but forgot to take White’s wallet. Twenty minutes later he cut open the window screen, climbed in, took the wallet, and left. Johnson said he later threw the wallet in an area where a road surveyor later found it.
Johnson v. State, 660 So.2d 637, 641 (Fla.1995). For the capital offense, the jury recommended by a vote of eight to four that Johnson be put to death. In sentencing Johnson to death, the trial court found three aggravating factors — prior violent felony, commission of a murder for financial gain, and heinous, atrocious, or cruel (HAC) — along with fifteen mitigating factors, including that Johnson suffered mental pressure not reaching the level of statutory mitigation. The trial court then *1015 found that each aggravating factor alone outweighed all of the mitigating factors and sentenced Johnson to death. Johnson, 660 So.2d at 641.
Johnson raised ten claims on direct appeal: (1) his confession was involuntary and should have been suppressed; (2) the search warrant and accompanying affidavit were improper and the resulting evidence should have been suppressed; (3) the trial court erred in denying a voir dire challenge for cause; (4) this Court should consider the arguments raised in Johnson’s appeal from his conviction of the McCahon murder; (5) the trial court improperly limited the presentation of mitigating evidence; (6) Johnson was prejudiced by the State’s eliciting of improper testimony and improper closing argument; (7) the trial court improperly rejected the extreme mental disturbance mitigating factor; (8) the trial court committed various errors when instructing the jury; (9) the felony-murder aggravator is an unconstitutional “automatic” aggravator; and (10) the standard jury instruction given on the HAC aggravator was constitutionally infirm. Id. at 641-48. This Court denied each of Johnson’s claims, found the death penalty to be proportionally warranted, and affirmed Johnson’s convictions and sentences. Id. at 648.
II. MOTION FOR POSTCONVICTION RELIEF
A. Procedural Background
In March 1997, Johnson filed a shell motion for posteonvietion relief pursuant to Florida Rule of Criminal Procedure 3.850. After several rulings from both the posteonvietion court and this Court tolling the time for Johnson to file an amended posteonvietion motion,[1] as well as multiple amended motions for posteonvietion relief filed by Johnson with leave to further amend, Johnson’s posteonvietion claims moved forward on an amended motion for posteonvietion relief filed in September 2003 and an addendum filed in December 2003.
Johnson raised the following claims before the posteonvietion court: (1) defense counsel provided ineffective assistance by mishandling mental health experts; (2) the State committed prosecutorial misconduct by manipulating the trial schedule of Johnson’s four trials and failing to make timely disclosure of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), rendering defense counsel ineffective in conducting Johnson’s defense; (3) the State engaged in prosecutorial misconduct by offering evidence of sperm after an Federal Bureau of Investigation (FBI) report stated that none had been found, and defense counsel was ineffective in failing to object to the State’s misconduct; (4) defense counsel was ineffective in failing to call a competent mental health expert at Johnson’s penalty phase trial; (5) the prior violent felony aggravator was based on invalid convictions; (6) Rule Regulating the Florida Bar 4 — 3.5(d)(4) unconstitution *1016 ally prevented Johnson, through his counsel, from interviewing jurors and thereby also rendered defense counsel’s assistance ineffective; (7) as applied, the Florida death sentencing statute is unconstitutional; (8) the trial court denied Johnson due process of law by preventing him from informing the jury about his ineligibility for parole and the possible sentences he would likely receive in other pending criminal cases; (9) Johnson’s death sentence is unconstitutional because the penalty phase jury instructions improperly shifted the burden of proof to Johnson, and defense counsel was ineffective in failing to object to the improper jury instructions; (10) Florida’s method of execution by lethal injection constitutes cruel and unusual punishment; (11) Johnson’s convictions are materially unreliable based on the cumulative effect of the errors during his guilt and penalty phase trials; (12) Johnson’s death sentence constitutes cruel and unusual punishment because Johnson may be incompetent at the time of execution; (13) the State engaged in prosecutorial misconduct by arguing facts not in evidence, and defense counsel was ineffective in failing to challenge the State’s improper argument; (14) the State engaged in pros-ecutorial misconduct by presenting false evidence at the suppression hearing, and defense counsel was ineffective in failing to challenge the State’s misconduct; (15) the State engaged in prosecutorial misconduct by presenting inconsistent theories, and defense counsel was ineffective in failing to challenge the State’s misconduct; (16) defense counsel rendered ineffective assistance by failing to introduce evidence of Johnson’s actual innocence; (17) the State’s use of illegally obtained rolled fingerprints was unconstitutional; (18) the State violated due process by destroying potentially useful evidence in bad faith; (19) Johnson’s arrest, search, and seizure were all based on a defective affidavit that contained false statements, and defense counsel was ineffective for failing to present these facts at the suppression hearing; and (20) the search warrants were not issued by a neutral magistrate, and defense counsel was ineffective in failing to discover and present this claim.
All but four of Johnson’s postconviction claims raised in this case correlated with substantially similar claims raised in his parallel postconviction motion challenging his convictions and sentences for the McCahon murder. See Johnson v. State, 104 So.3d 1032, 1034-35 (Fla.2012). Because of the significant interrelation between Johnson’s postconviction motion in this case and his postconviction motion regarding the McCahon murder, the post-conviction court held a consolidated hearing on both motions pursuant to Huff v. State, 495 So.2d 145 (Fla.1986), on September 21, 2005. Following the Huff hearing, the postconviction court entered a single order granting an evidentiary hearing on the first four of Johnson’s postconviction claims in this case — which were substantially indistinguishable from Johnson’s first four claims in the McCahon murder post-conviction proceeding — and summarily denying the remainder of Johnson’s postcon-viction claims relating to White’s murder. State v. Johnson, Nos. CF 88-3198, et al. (Fla. 12th Cir. Ct. order filed Mar. 1, 2007).
Before the evidentiary hearing was held, Johnson filed several pro se pleadings seeking to discharge collateral counsel and raising additional claims that he believed were not adequately addressed by collateral counsel. Ultimately, Johnson withdrew his attempts to discharge counsel, and collateral counsel adopted six of Johnson’s pro se claims. The additional claims alleged that the search warrant, the affidavit in support of the warrant, and the inventory list of items obtained pursuant to the *1017 warrant were false in that each document was backdated and signed after the search of his premises had been completed. Specifically, Johnson argued that: (21) the State had the duty to disclose the false documents because they constituted impeachment evidence; (22) the State had a duty to disclose that the false documents had been filed; (23) the State committed a fundamentally unfair act by fabricating, filing, and relying on the false documents; (24) the judge who backdated and signed the false documents was not neutral and detached; (25) the State committed per se reversible error by using and failing to advise the defense about the false documents; and (26) Johnson’s claims regarding the false documents are not procedurally barred because he was deprived of substantive due process. The postconviction court issued a single order and summarily denied each of Johnson’s additional claims, holding that the conclusory allegations contained therein were insufficient to require an evidentiary hearing, that the claims should have been raised on appeal, and that Johnson had previously argued the issues during the Huff hearing. State v. Johnson, Nos. 88 CF 3198, et al. (Fla. 12th Cir. Ct. order filed Apr. 28, 2009).
B. Evidentiary Hearing Testimony
At an evidentiary hearing held on August 3 and 4, 2009, the postconviction court heard testimony from Johnson’s three trial attorneys — Adam Tebrugge, Tobey Hock-ett, and Eliot Metcalfe — regarding the defense’s pretrial management of four experts — Dr. Walter Afield, Dr. Michael Maher, Dr. Richard Ofshe, and Dr. John Brigham. Attorney Tebrugge, who was Johnson’s primary attorney for the penalty phase of the trials regarding both the White and McCahon murders, testified regarding Dr. Afield, who was appointed by the trial court pursuant to Florida Rule of Criminal Procedure 3.216 in order to determine whether Johnson was competent to stand trial and whether Johnson may have been insane at the time he committed the murders. Tebrugge testified that throughout the preparation for Johnson’s trials, he had developed concerns with Dr. Afield’s potential testimony and ultimately was convinced that Dr. Afield would not be a helpful witness to the defense. Te-brugge further testified that the decision not to use Dr. Afield as a witness during either Johnson’s guilt or penalty phase trials was based on the defense’s feeling that Dr. Afield would not be a helpful witness. Tebrugge testified that the decision was not based on any threat by the State to present contradicting expert testimony if the defense called Dr. Afield as a witness.
Attorney Metcalfe, who at the time of Johnson’s trials was the Public Defender for the Twelfth Judicial Circuit, testified to similar effect. Metcalfe testified that the defense could not get a straight answer from Dr. Afield regarding whether a valid basis existed on which to rest an insanity defense and that, as a result, he believed that Dr. Afield’s testimony would undermine any attempted insanity defense. Metcalfe testified that for this reason, he was nervous about calling Dr. Afield as a witness and that he ultimately became uncomfortable with using Dr. Afield for any purpose whatsoever. Metcalfe testified that Johnson’s trial team had conducted strategy sessions regarding whether to use Dr. Afield as a witness and that the attorneys had ultimately decided against using Dr. Afield at trial.
Regarding the decision to make Dr. Afield available for a deposition, Attorney Hockett, who worked primarily on the pretrial aspects of Johnson’s trials, testified that the defense had originally listed Dr. Afield as a potential witness, which allowed the State to depose him. Hockett testified *1018 that when, during the deposition, the State asked Dr. Afield to disclose confidential information regarding his conversations with Johnson, Hockett objected to the State’s question but did not feel that he could do anything else to prevent Dr. Afield from answering the question.
Dr. Afield also testified at the evidentia-ry hearing. Dr. Afield testified that he had evaluated Johnson on October 27, 1988, while Johnson was incarcerated. Dr. Afield recalled his impression that Johnson was chronically retarded and schizophrenic and that Johnson had been attempting to control his psychosis with prescription medication and cocaine, both of which made the psychosis worse. Dr. Afield testified that he had discussed the possibility of an insanity defense with Johnson’s trial counsel and had informed them that such a defense might be possible but that he would need more information to be certain. However, Dr. Afield testified that after he was deposed in September 1990, he did not hear from counsel again regarding the possibility of pursuing an insanity defense. Thus, in April 1991, he submitted a report advising trial counsel that he did not believe there was a basis for an insanity defense. On cross-examination, Dr. Afield testified that he did not believe that Johnson could have been faking insanity by pretending to be delusional. In Dr. Afield’s opinion, Johnson was too mentally retarded to pretend to be insane. On redirect, Dr. Afield admitted that Johnson’s IQ was roughly 100, which is normal, although Dr. Afield stated that other tests were indicative of brain dysfunction. Dr. Afield also recalled that, during his evaluation, Johnson made admissions regarding the crimes with which he was charged.
Regarding Dr. Maher, attorney Te-brugge testified that based on his dissatisfaction with Dr. Afield, he decided to employ Dr. Maher, a psychiatrist who specialized in the areas of substance abuse and cocaine psychosis. Tebrugge testified that after the defense listed Dr. Maher as a potential witness, Dr. Maher was deposed by the State, during which he made several statements regarding admissions made by Johnson. Tebrugge testified that based on Dr. Maher’s deposition, he decided not to call Dr. Maher as a witness after discussing the issue with Johnson. Tebrugge also testified that the State had threatened to call Dr. Maher as a State’s witness based on the information he revealed during his deposition. Te-brugge objected to the State’s threat on the grounds that any admissions made by Johnson to Dr. Maher were privileged and could not be introduced at trial. Te-brugge testified that it was his belief that although listing Dr. Maher as a potential witness allowed the State to depose him and waived any attorney-client privilege attached to Dr. Maher, such waiver could be revoked by removing Dr. Maher as a potential witness.
Regarding Dr. Ofshe, an expert in coerced confessions, attorney Hockett testified that the defense saw Dr. Ofshe as its best chance to suppress Johnson’s confession because Dr. Ofshe believed that the confession had been coerced and because Dr. Ofshe had intentionally avoided asking Johnson any questions that could lead to admissions regarding the crimes. Hockett testified that the defense had presented Dr. Ofshe’s testimony at the motion to suppress hearing but that, after the court denied the defense’s motion, the defense never considered using Dr. Ofshe as a guilt phase witness. Hockett testified that the defense decided it would not be helpful to present Dr. Ofshe as a witness at trial because it had already preserved the issue at the suppression hearing and because repeating a week’s worth of testimony would not have aided the defense.
*1019 Regarding Johnson’s claim that the State’s manipulation of Johnson’s four trial dates had rendered Johnson’s counsel ineffective, attorney Hockett recalled that the defense had worked on securing Dr. Brigham, an expert in eyewitness identification, as an expert in the case regarding victim Cornell. Hockett testified that the defense had made multiple attempts to continue Johnson’s trial schedule in order that Dr. Brigham could have time to adequately prepare for the trial regarding victim Cornell but that the trial court had denied the defense’s motions for continuance. Attorney Metcalfe similarly testified that the defense had discussed using Dr. Brigham as an expert in eyewitness identification in the trial regarding victim Cornell and possibly also the trial regarding victim Gid-dens.
Dr. Brigham also testified at the eviden-tiary hearing. Dr. Brigham testified that he had been contacted in the late spring of 1991 by attorney Hockett about the possibility of testifying as an expert witness in the trial regarding victim Cornell. After reviewing some materials from the case, Dr. Brigham replied that he would not have the chance to fully review the necessary materials before trial but that, if the trial were to be postponed, he would be interested in participating. Dr. Brigham acknowledged that he had sent Hockett a letter on April 18, 1991, stating that his testimony would be most useful regarding the effect that exposure to several prior photo lineups would have had on a witness’s ability to correctly identify a perpetrator from a subsequent lineup. Dr. Brigham claimed that — had he been able to testify at trial — he would have assisted Johnson’s trial attorneys in cross-examining any eyewitness. On cross-examination, Dr. Brigham admitted that he would have testified at trial only regarding general principles of eyewitness identification. Dr. Brigham also admitted that he had not performed an actual study on Cornell’s identification. On redirect, Dr. Brigham clarified that had he been employed as an expert by the defense, he would have conducted a thorough study of all relevant records and reached an expert opinion regarding Cornell’s eyewitness identification of Johnson.
The postconviction court also heard the testimony of Marjorie Hammock, a professor of social work who was tendered by collateral counsel as a mitigation specialist based on her expertise in biopsychosocial assessments — á tool for explaining how individuals came to be in a particular situation in their lives. Ms. Hammock performed a biopsychosoeial assessment of Johnson, reviewed the Department of Corrections’ records for Johnson, examined his health, mental health, and school records (grades one through six), and read interviews with several of Johnson’s family members and other individuals involved in the case. Ms. Hammock also personally interviewed several of Johnson’s family members and interviewed Johnson himself three times. Based on these sources, Ms. Hammock testified that poverty and abandonment were key patterns in Johnson’s life. Ms. Hammock also testified that Johnson felt oppressed by the white community and that Johnson had been ridiculed by the teachers and children at his school. Ms. Hammock stated that Johnson had attempted to commit suicide twice — once as a young teenager by taking his mother’s antidepressant pills and later by attempting to slit his wrists while incarcerated — and that Johnson used crack cocaine extensively by the time of the murders. Ms. Hammock then testified regarding the miscarriage of Johnson’s first child and the effect it had on him, including that he carried a picture of the dead child with him and showed it to everyone. Ms. Hammock concluded that Johnson had *1020 been in psychological distress for most of his life and that he was unable to deal with the issues that confronted him.
On cross-examination, Ms. Hammock testified regarding Beverly Ackerman, an investigator employed by Johnson’s trial counsel for the purpose of gathering mitigation evidence. Ms. Hammock agreed that she and Ms. Ackerman had interviewed many of the same people and read many of the same records. Ms. Hammock admitted that Ms. Ackerman had interviewed some people and reviewed some records that Ms. Hammock had not. Ms. Hammock claimed, however, that although much of her investigation overlapped with Ms. Ackerman’s investigation, the information that she gathered from the records and interviews was not necessarily the same as that gathered by Ms. Ackerman. Attorney Metcalfe also testified regarding Ms. Ackerman, recalling that his strategy was to gather as much information about Johnson as possible. To this effect, Met-calfe had sent Ms. Ackerman to Johnson’s hometown in Mississippi because he felt that as a black female, Ms. Ackerman would have the best chance of connecting with and getting information from Johnson’s family and community.
C. Postconviction Court’s Ruling
Following the evidentiary hearing, the postconviction court issued an order denying Johnson’s remaining postconviction claims. Regarding Johnson’s first claim that his trial counsel rendered ineffective assistance by mishandling the defense’s mental health expert witnesses, the post-conviction court held that counsel was not ineffective in failing to call Dr. Afield as a witness because (1) it was clear that the decision was a tactical one based on the fact that Dr. Afield’s testimony would have been more harmful than helpful to the defense; and (2) Johnson had not established prejudice in light of this Court’s ruling on direct appeal that the evidence of Johnson’s mental disturbance — as presented in full at the suppression hearing at which Dr. Afield testified — did not rise to the level of a statutory mitigator. Johnson, 660 So.2d at 646-47. Similarly, regarding counsel’s decision not to call either Dr. Maher or Dr. Ofshe at trial, the post-conviction court concluded that counsel’s performance was not deficient, but was strategic based on the content of both doctors’ potential testimony and that Johnson was not prejudiced by the lack of testimony. Furthermore, the court ruled that Johnson was not prejudiced by his counsel’s decision to allow each of the doctors to be deposed because none of counsel’s decisions regarding the doctors were influenced by the State’s threat to call Dr. Maher at trial.
The postconviction court also denied the portion of Johnson’s second claim alleging that defense counsel mishandled Dr. Brigham during the trial relating to victim Cornell and that Johnson was prejudiced by counsel’s deficiency because his conviction in that case was used as an aggravator in the capital cases. The court found that counsel was not deficient because the requests for continuance in order to accommodate Dr. Brigham’s schedule were denied and that Johnson had suffered no prejudice because Dr. Brigham’s testimony was by no means certain to be admitted at trial. The court also found that even in Dr. Brigham’s absence, Johnson’s trial counsel intensely challenged Ms. Cornell’s identification of Johnson.
Finally, the postconviction court denied Johnson’s claim that his counsel was ineffective in failing to hire a mitigation expert to investigate and testify at Johnson’s penalty phase trial. The court determined that counsel was not deficient because mitigation had been a central focus of the defense, as evidenced by Ms. Ackerman’s *1021 investigation. The court found that Ms. Hammock would have performed substantially the same in investigating and reporting mitigating evidence as did Ms. Acker-man. The court concluded that Johnson’s argument that an expert such as Ms. Hammock would have presented the evidence more articulately or credibly was nothing more than second-guessing his trial counsel’s strategic decisions. The court further concluded that Johnson had failed to establish prejudice because much of the information testified to by Ms. Hammock was expressed clearly, articulately, and credibly by Johnson’s family members during his penalty phase trial.
The postconviction court made no ruling regarding Johnson’s allegations in his second claim that the State had failed to timely disclose exculpatory evidence. The postconviction court also failed to address Johnson’s third claim alleging prosecutorial misconduct relating to evidence of sperm found at the crime scene. However, shortly after its order following the evidentiary hearing, the postconviction court sua sponte issued another order clarifying that it also denied the remainder of Johnson’s second claim as well as Johnson’s third claim regarding the sperm evidence.
Accordingly, the court denied Johnson’s postconviction motion in its entirety. Johnson now appeals the court’s rulings regarding several of his postconviction claims. For the reasons set forth below, we affirm the circuit court’s denial of Johnson’s motion for postconviction relief.
III. ANALYSIS
On appeal, Johnson first raises three claims challenging the postconviction court’s denial of his claims on which an evidentiary hearing was held. Johnson then raises nine claims challenging the postconviction court’s summary denial of his other postconviction claims, including some claims originally raised pro se and later adopted by collateral counsel.
A. Claims Denied After Evidentiary Hearing
Johnson argues that the postconviction court erred in denying three ineffective assistance of counsel claims: (1) counsel was ineffective in mishandling multiple mental health expert witnesses before trial and failing to present a mental health expert during trial; (2) counsel’s deficiency in failing to effectively pursue Dr. Brigham as an expert witness in the trial regarding victim Cornell prejudiced Johnson when his conviction from the noncapital case was used to establish an aggravating factor regarding the White murder; and (3) counsel was ineffective in failing to present a mitigation expert at trial and in failing to properly authenticate medical records.
In order to gain relief on his ineffective assistance claims, Johnson “must show that his attorney’s performance was deficient and that the deficient performance prejudiced his defense.” Sochor v. State, 883 So.2d 766, 771 (Fla.2004) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To establish deficient performance, Johnson must show that his counsel’s representation “fell below an objective standard of reasonableness” by committing errors “so serious that counsel was not functioning as the ‘counsel’ guaranteed ... by the Sixth Amendment.” Id. (quoting Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052). To establish prejudice, Johnson must show that counsel’s errors “were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.” Id. (alteration in original) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). In the context of the penalty phase, “the question is whether there is a reasonable probability that, absent the errors, the sentencer ... *1022 would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Id. (alteration in original) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052); see also Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (holding that a defendant is not required to show that “counsel’s deficient conduct more likely than not altered the outcome” of his penalty phase trial, but rather to establish “a probability sufficient to undermine confidence in [that] outcome”) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052).
We review de novo the postconviction court’s rulings on the Strickland performance and prejudice prongs, but defer to that court’s findings of fact as long as such findings are supported by competent, substantial evidence in the record. Porter v. State, 788 So.2d 917, 923 (Fla.2001) (“We recognize and honor the [postconviction] court’s superior vantage point in assessing the credibility of witnesses and in making findings of fact.”); see also Sochor, 883 So.2d at 771 (noting that “we apply [this] mixed standard of review because both the performance and the prejudice prongs of the Strickland test present mixed questions of law and fact”).
Johnson first claims that the posteonviction court erred in denying his ineffective assistance of counsel claim based on the trial counsel’s mishandling of multiple expert witnesses and failure to present a mental health expert during Johnson’s penalty phase trial. Specifically, Johnson argues that counsel erred in allowing Dr. Afield and Dr. Maher to be deposed and further erred when, during the depositions, counsel failed to prevent the doctors from revealing privileged information regarding White’s murder. Johnson alleges that the State thereafter used their knowledge of the privileged information to preclude the defense from using any mental health expert, including Dr. Ofshe, at his penalty phase trial.
Regarding this claim, the postconviction court found that defense counsel’s decisions not to use Dr. Afield, Dr. Maher, and Dr. Ofshe as witnesses at Johnson’s trial were strategic. This finding is supported by competent, substantial evidence in the record. Both attorney Tebrugge and attorney Metcalfe testified at the evidentiary hearing that they had developed concerns regarding Dr. Afield’s potential testimony and had ultimately decided that he would not be a helpful witness at either the guilt or penalty phase trial. Tebrugge also testified that he had made the decision not to call Dr. Maher as a witness after consulting with Johnson because it became clear that Dr. Maher’s testimony would be damaging based on the admissions that Johnson had made to him. Moreover, attorney Hockett testified that the decision not to call Dr. Ofshe at trial was a strategic choice predicated on the fact that the defense had sufficiently preserved a challenge to the admission of Johnson’s confession through Dr. Ofshe’s testimony at the suppression hearing and that the defense felt that repeating a week’s worth of detailed testimony on that issue would not be helpful at trial. Additionally, the record shows that Dr. Ofshe’s testimony would have contained information detrimental to Johnson’s defense, such as Johnson’s admission to Dr. Ofshe that Johnson had manipulated other experts and doctors in an attempt to establish mental incapacity. Finally, all three attorneys testified that their decisions regarding the expert witnesses were strategic trial tactics that were in no way influenced by the State’s threat to call Dr. Maher as a witness.
Accepting the postconviction court’s findings, we now review de novo counsel’s actions under both prongs of the Strickland test. See Porter, 788 So.2d at 923. *1023 We conclude that Johnson’s trial counsel was not deficient in its handling of Drs. Afield, Maher, and Ofshe.
“This Court has ‘consistently held that a trial counsel’s decision to not call certain witnesses to testify at trial can be reasonable trial strategy.’ ” Johnston v. State, 63 So.3d 730, 741 (Fla.2011) (quoting Everett v. State, 54 So.3d 464, 474 (Fla.2010)). “It is reasonable for trial counsel to forego evidence that, if presented in mitigation, could damage a defendant’s chances with the jury.” Id. (quoting Nelson v. State, 43 So.3d 20, 32 (Fla.2010)); see also Reed v. State, 875 So.2d 415, 437 (Fla.2004) (“An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.”). Thus, “[tjrial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.” Gaskin v. State, 822 So.2d 1243, 1248 (Fla.2002).
Here, calling either Dr. Afield or Dr. Maher to testify would have opened the door to damaging testimony. Both Dr. Afield and Dr. Maher testified at their depositions that Johnson had made admissions to them regarding White’s murder. Dr. Afield testified that Johnson had admitted that he killed two people in “January or March or something, and ... [o]ne was a lady [he] knew, and [he] went into a rage.” Dr. Maher similarly testified regarding statements made by Johnson implicating him in the White and McCahon murders. Had the defense chosen to present the testimony of either doctor during either phase of Johnson’s trial, Johnson’s defense stood to be severely damaged by cross-examination of the doctors. Accordingly, counsel was not deficient in failing to call Dr. Afield or Dr. Maher at trial. See Johnston, 63 So.3d at 741.
For the same reason, counsel was not deficient in failing to call Dr. Ofshe as a witness. At the suppression hearing, Dr. Ofshe testified that Johnson had tried to manipulate him during their interview and that Johnson had admitted to “malingering” and giving false information to doctors who examined him in order to support an insanity defense. Dr. Ofshe also testified that Johnson had admitted to performing a half-hearted suicide attempt in an effort to convince doctors that he was mentally unstable. Presenting Dr. Ofshe as a witness would therefore have opened the door to harmful testimony. Moreover, as attorney Hockett testified at the eviden-tiary hearing, the trial court had already ruled on the admissibility of Johnson’s confession during the suppression hearing, and the defense had taken the necessary steps at that hearing to preserve the issue for appeal. Johnson may not now use an ineffective assistance of counsel claim to merely second guess the legitimate strategic trial decisions of his counsel. Wright v. State, 581 So.2d 882, 883 (Fla.1991) (holding that alleged errors that “are strategic in nature” do not establish deficient performance because “this Court will not second guess trial strategy employed by trial counsel”).
We also reject Johnson’s claim that his trial counsel was ineffective in allowing Dr. Afield and Dr. Maher to be deposed and to answer questions concerning privileged information. Dr. Afield was a confidential advisor appointed pursuant to Florida Rule of Criminal Procedure 3.216(a) to aid the defense in determining whether Johnson was either incompetent to stand trial or had been insane at the time of the offense. On September 14, 1989, the defense notified the State and the trial court of its intent to rely on the *1024 insanity defense and listed Dr. Afield as a witness to that effect. Thereafter, on September 21, 1990, Dr. Afield was deposed by the State. It was not until April 30, 1991, that the defense withdrew its intent to rely on the insanity defense.
We have previously held that under rule 3.216(a), “where an expert is hired solely to assist the defense and will not be called as a witness, the State may not depose the expert or call him as a witness.” Sanders v. State, 707 So.2d 664, 669 (Fla.1998). Here, however, the rule barring depositions does not apply because Dr. Afield was listed as a witness at the time he was deposed. Johnson has therefore not demonstrated that his counsel erred in allowing Dr. Afield to be deposed. See Sanders, 707 So.2d at 669. For the same reason, counsel was not deficient in allowing Dr. Maher to be deposed. Dr. Maher was listed as a defense witness at the time of his deposition.
Nor was Johnson’s trial counsel deficient in failing to prevent Dr. Afield or Dr. Maher from divulging privileged information during their respective depositions. We have previously recognized that rule 3.216(a) is a codification of the Third District Court of Appeal’s holding in Pouncy v. State, 353 So.2d 640 (Fla. 3d DCA 1977). See Sanders, 707 So.2d at 669. In Poun-cy, the Third District held that the trial court’s ruling allowing the State to depose psychiatrists hired by the defendant to aid in the preparation of the defense “violated the attorney-client privilege by permitting the State to (1) depose the doctors and (2) use them as State’s witnesses when appellant had no intention to utilize the psychiatrists as defense witnesses.” Id. at 642. The Third District explicitly noted, however, that “[s]aid privilege would have, of course, been waived, had appellant utilized his psychiatrists as witnesses.” Id. Thus, under Pouncy — as codified in rule 3.216— a defendant waives the attorney-client privilege as it attaches to a confidential rule 3.216(a) expert witness when the defense notifies the State and the trial court of its intent to utilize the expert as a witness at trial.
Here, because Dr. Afield was listed as a defense witness at the time of his deposition, Johnson had waived the privilege attached to Dr. Afield. Johnson’s counsel was therefore not deficient in failing to prevent Dr. Afield from answering questions regarding communications between Johnson and himself. Johnson similarly waived any privilege attached to Dr. Maher by notifying the State and the trial court of his intent to rely on Dr. Maher as a witness at trial. Although Dr. Maher was not appointed as a confidential advisor pursuant to rule 3.216(a), which provides that the trial court shall only “appoint [one] expert to examine the defendant in order to assist counsel in the preparation of the defense,” the same reasoning applies. Where a defendant notifies the court of his intent to use an expert as a witness at trial, any privilege attached to that expert is waived insofar as such notification remains in effect. See Sanders, 707 So.2d at 669; Pouncy, 353 So.2d at 641-42.
As his second issue, Johnson argues that the postconviction court erred in denying his ineffective assistance claim based on his trial counsel’s handling of Dr. Brigham, the eyewitness identification expert. Johnson claims that his counsel— who was the same for both of his capital eases as well as the noncapital cases — was deficient in failing to effectively pursue Dr. Brigham as an expert witness in the non-capital case regarding victim Cornell. Because Johnson’s conviction in that case was used to find the prior violent felony aggravating factor in this case, Johnson claims that counsel’s deficiency in that case caused him prejudice in this case. We *1025 reject Johnson’s argument. Johnson’s claim is analogous to the claim addressed by the United States Supreme Court in Johnson v. Mississippi, 486 U.S. 578, 583-90, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), which granted postconviction relief on a defendant’s claim that the sentencing court’s finding of the prior violent felony aggravator based on a reversed conviction was unconstitutional. We have previously held that a Johnson claim is not cognizable as long as the conviction underlying the aggravating factor is still a valid conviction. See Lukehart v. State, 70 So.3d 503, 513 (Fla.2011). Here, Johnson has not succeeded in vacating his conviction in the noncapital case based on counsel’s handling of Dr. Brigham or on any other basis. Because Johnson’s conviction in the noncapital ease is still a valid conviction, we conclude that the postconviction court properly denied Johnson’s claim relating to Dr. Brigham.
Third, Johnson challenges the posteonviction court’s ruling denying his claim that trial counsel was ineffective for failing to present a mitigation expert during his penalty phase trial. Regarding the mitigation issue, the postconviction court found that mitigation had been a focus of Johnson’s trial counsel and that counsel had sent Ms. Ackerman to Johnson’s hometown in an effort to gather as much mitigation evidence as possible. The court also found that although Ms. Hammock spoke with many of Johnson’s family members and reviewed many of his records in forming her conclusion regarding what testimony a mitigation expert would have offered at trial, Ms. Ackerman interviewed many of the same people and reviewed many of the same records prior to Johnson’s trials. Additionally, the court found that Ms. Ackerman had reviewed numerous reports that Ms. Hammock did not review. The court further found that much of the information that Ms. Hammock or a similar mitigation expert would have testified to at trial had been testified to by family members, who expressed the information in a clear, articulate, and credible manner.
The record supports the postconviction court’s findings. Ms. Hammock testified at the evidentiary hearing that she had reviewed substantially the same information and interviewed the same witnesses as Ms. Ackerman, such that much if not most of her investigation was included in the report that Ms. Ackerman had put together in preparation for trial. Ms. Hammock also admitted that Ms. Ackerman had reviewed some records that she had not reviewed herself. Moreover, the record shows that much of the same information testified to by Ms. Hammock during the evidentiary hearing was presented at trial through the testimony of several of Johnson’s family members and friends — including testimony regarding the impoverished conditions and familial discord Johnson endured as a child and the effect that the miscarriage of his child had on Johnson during his adult years. We therefore defer to the postconviction court’s findings regarding this issue.
We conclude that Johnson has not established that his trial counsel was deficient for failing to present the testimony of a mitigation expert during his penalty phase trial. A eonclusory claim that defense counsel was deficient for failing to hire a mitigation expert is without merit. Hoskins v. State, 75 So.3d 250, 256 (Fla.2011). Johnson argues that a mitigation expert would have been more articulate, forthcoming, and credible than the lay witnesses presented by the defense. Yet Johnson has failed to show why an expert such as Ms. Hammock would have been a more effective mitigation witness than the dozen lay witnesses who knew Johnson *1026 personally and testified at his penalty phase trial — many of whom Ms. Hammock interviewed when compiling her mitigation report. See id. (“Failure to use an ‘expert’ in mitigation investigation does not per se constitute ineffective assistance.”). Moreover, the conclusions testified to by Ms. Hammock at the evidentiary hearing correlated with the substance of the lay testimony presented at Johnson’s penalty phase trial. “We have repeatedly held that counsel is not ineffective for failing to present cumulative evidence.” Jones v. State, 998 So.2d 573, 586 (Fla.2008). Accordingly, we deny Johnson’s claim as it relates to trial counsel’s decision not to use a mitigation expert for purposes of compiling and presenting mitigation evidence.
Johnson also argues that the testimony of a mitigation expert would have enabled trial counsel to introduce “medical records about various psychological problems [Johnson] had over many years, including [two] suicide attempts and treatment by medication.” Johnson, 660 So.2d at 645. The trial court refused to admit the records because Johnson’s counsel had not authenticated them and because the trial court “found that the records were not complete in themselves and required interpretation to be understood by the jury.” Id. Johnson now claims that the testimony of a mitigation expert would have served as the predicate necessary to support the records and also would have provided the interpretation required for the records to be understood by the jury.
We conclude that Johnson suffered no prejudice as a result of counsel’s failure to introduce the medical records through a mitigation expert or otherwise. Johnson has not established “a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” So-chor, 883 So.2d at 771 (alteration in original) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052).
During Johnson’s penalty phase trial, the jury heard testimony from Johnson’s mother regarding one of Johnson’s suicide attempts, which occurred when Johnson was thirteen. Although the jury did not hear evidence regarding Johnson’s attempt on his life after he had been arrested for White’s murder, any evidence of that attempt that was introduced to establish mental mitigation would have opened the door to harmful testimony. As stated above, Dr. Ofshe testified at the suppression hearing that Johnson had admitted that his post-incarceration suicide attempt was a half-hearted effort to convince doctors that he was mentally ill. Johnson has not shown any plausible reason why the State could not have simply called Dr. Ofshe in rebuttal if the defense had introduced medical records of Johnson’s second suicide attempt. Thus, because the jury heard evidence of Johnson’s first attempt and because evidence of Johnson’s second attempt could have opened the door to harmful testimony, Johnson has not established a reasonable probability that the jury would have voted against death if the records had been introduced.
For the same reasons, Johnson has not established a reasonable probability that the trial court would have sentenced Johnson differently in light of the evidence contained in the records. Moreover, in sentencing Johnson to death for White’s murder, the trial court found three aggravating factors — prior violent felony, commission of a murder for financial gain, and HAC — and fifteen mitigating factors. Johnson, 660 So.2d at 641. Included in the mitigating factors was that Johnson “suffered mental pressure not reaching the level of statutory mitigation.” Id. The trial court “then found that each aggravating *1027 factor alone outweighed all the mitigating factors.” Id. Johnson has not shown a reasonable probability that — based on the medical records — the trial court would have found that Johnson’s mental state reached the level of statutory mitigation. Nor has Johnson shown that, even if the trial court had found the statutory mental mitigator, it would have concluded that the weight of the mitigators overcame the weight of all three aggravating circumstances. Johnson’s allegations of deficiency therefore do not undermine our confidence in the outcome of his penalty phase proceeding. Accordingly, we deny Johnson’s claim.
B. Summarily Denied Claims
Johnson also challenges the postconvietion court’s summary denial of several of his postconviction claims. A postconviction court may deny a defendant’s claim asserted in a rule 3.850 motion if “(1) the motion, files, and records in the case conclusively show that the movant is entitled to no relief, or (2) the motion or particular claim is legally insufficient.” Franqui v. State, 59 So.3d 82, 95 (Fla.2011).[2] Legally insufficient claims include those that are procedurally barred. See Freeman v. State, 761 So.2d 1055, 1063-72 (Fla.2000) (applying same two-part standard as Franqui and holding that several of defendant’s rule 3.850 claims were procedurally barred and therefore properly summarily denied). Claims that should have been raised on direct appeal are procedurally barred from being raised in collateral proceedings. Id. at 1063. Moreover, in establishing a prima facie case based on a legally valid claim, “mere con-clusory allegations are insufficient.” Franqui, 59 So.3d at 96. Reviewing the postconviction court’s summary denial of Johnson’s claims, we accept Johnson’s factual allegations as true “to the extent they are not refuted by the record.” Id. at 95. We now address Johnson’s specific challenges to the postconviction court’s summary denial of his claims.
As his fourth issue on appeal, Johnson claims that the postconviction court erred in summarily denying his claim that the trial court’s finding of the prior violent felony aggravator is based on an invalid conviction in violation of Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). As we stated above, a Johnson claim is not cognizable as long as the conviction underlying the aggravating factor is still a valid conviction. See Lukehart, 70 So.3d at 513. Here, the trial court based its finding of the prior violent felony aggravator on Johnson’s convictions in the three other cases. Because Johnson’s convictions in those cases are still valid, Johnson’s claim is legally insufficient. The postconviction court therefore did not err in summarily denying Johnson’s claim.
Fifth, Johnson challenges the postcon-viction court’s summary denial of his claim that Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional to the extent it precludes Johnson’s collateral counsel from interviewing the jurors who convicted him and recommended that he be put to death. We conclude that the postconviction court did not err in denying Johnson’s claim without an evidentiary hearing. Johnson’s claim is both procedurally barred and without merit. See Kilgore v. State, 55 So.3d 487, 511 (Fla.2010) (holding a challenge to the constitutionality of rule 4 — 3.5(d)(4) procedurally barred in postcon-viction proceedings and noting moreover *1028 that “this Court has repeatedly rejected claims that Rule Regulating the Florida Bar 4 — 3.5(d)(4) is unconstitutional”).
As his sixth claim, Johnson argues that Florida’s death sentencing statute, as applied, is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The motions and record in this case conclusively establish that Johnson is not entitled to relief on this claim. Johnson’s direct appeal of this case was final in 1995, and Ring — which was decided by the Supreme Court in 2002— does not apply retroactively to cases already final on direct review. See Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Moreover, the prior violent felony aggravator was found in this case, and “[t]his Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims.” Frances v. State, 970 So.2d 806, 822 (Fla.2007). Accordingly, we affirm the posteonviction court’s summary denial of this claim.
Seventh, Johnson challenges the postconviction court’s summary denial of his Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), claim that the trial court erred in preventing Johnson from informing the jury about his ineligibility for parole and the possible sentences he would likely receive in the other three cases. This Court previously denied this claim when Johnson raised it on direct appeal. Johnson, 660 So.2d at 645. Accordingly, we affirm the postconviction court’s summary denial of this claim as procedurally barred. See Freeman, 761 So.2d at 1067 (“This claim was raised on direct appeal; therefore, it is procedurally barred and was properly summarily denied.”).
For the same reason, we deny Johnson’s eighth claim — that the penalty phase jury instructions unconstitutionally shifted the burden to Johnson to prove that death was an inappropriate sentence. On direct appeal, this Court denied Johnson’s claim “that the standard [penalty phase jury] instructions impermissibly place the burden of proof on the defendant to prove a case for mitigation once aggravating circumstances have been established by the State.” Johnson, 660 So.2d at 647. Accordingly, the postconviction court did not err in summarily denying this claim as procedurally barred. See Freeman, 761 So.2d at 1067.
As his ninth claim, Johnson argues that Florida’s method of execution by lethal injection constitutes cruel and unusual punishment in violation of the Florida and United States Constitutions. Because this claim was not raised on direct appeal, it is procedurally barred. See Kilgore, 55 So.3d at 511-12 (holding that a defendant’s postconviction challenge to Florida’s method of execution was procedurally barred because it was not raised on direct appeal). Moreover, this Court has recently upheld the constitutionality of Florida’s current lethal injection procedure. See Valle v. State, 70 So.3d 530, 541 (Fla.) (holding that Valle failed to satisfy the heavy burden of proving that Florida’s current lethal injection procedure is constitutionally defective), cert. denied, — U.S. -, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011). Because Johnson has not made any additional allegations that would call into question the State’s current method of execution, his claim is conclusively refuted by the record. The postconviction court therefore properly denied Johnson’s claim without an evidentiary hearing.
Tenth, Johnson claims that his conviction and sentence for the White murder are materially unreliable due to the cumulative effect of the errors alleged in his postconviction motion. “Where multi- *1029 pie errors are found, even if deemed harmless individually, ‘the cumulative effect of such errors’ may ‘deny to defendant the fair and impartial trial that is the inalienable right of all litigants.’ ” Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (quoting Brooks v. State, 918 So.2d 181, 202 (Fla.2005)); see also Jackson v. State, 575 So.2d 181, 189 (Fla.1991). Johnson, however, has failed to identify multiple instances of error. And because multiple errors did not occur in this case, Johnson’s claim of cumulative error must fail.
We also deny Johnson’s eleventh claim, in which Johnson alleges that his Eighth Amendment right against cruel and unusual punishment may be violated because — at the time of his execution — Johnson might be incompetent to be executed. Considering that no death warrant has been signed in this case, the postconviction court’s summary denial of Johnson’s claim was proper. See, e.g., Sexton v. State, 997 So.2d 1073, 1089 (Fla.2008) (holding that claim of incompetency to be executed raised in initial postconviction motion was not ripe because prisoner was not under death warrant).
Finally, as his twelfth appellate issue, Johnson challenges the postconviction court’s ruling summarily denying various claims initially raised pro se but subsequently adopted by collateral counsel. These claims include: (a) the prosecutor engaged in misconduct by arguing facts not in evidence, and defense counsel was ineffective in failing to object to that misconduct; (b) the prosecutor engaged in misconduct by presenting false evidence at the suppression hearing, and defense counsel was ineffective in failing to object to that misconduct; (c) the prosecutor engaged in misconduct by presenting inconsistent theories, and defense counsel was ineffective in failing to object to that misconduct; (d) defense counsel rendered ineffective assistance by failing to introduce evidence of Johnson’s actual innocence; (e) the State used illegally obtained rolled fingerprints; and (f) Johnson’s arrest, search, and seizure were based on an affidavit that was both unsworn and contained false information, and defense counsel was ineffective in failing to present this fact at the suppression hearing.
We agree with the postconviction court that insofar as these claims raise issues concerning prosecutorial misconduct and evidence introduced at trial, the claims should have been challenged on direct appeal and are therefore procedurally barred. Spencer v. State, 842 So.2d 52, 60-61 (Fla.2003) (postconviction court properly concluded that claims alleging prosecutorial misconduct were procedurally barred because each of the alleged violations appeared on the trial record and could have been raised on direct appeal). Thus, the underlying issues in claims (a), (b), (c), and (f) are procedurally barred, as is the entirety of claim (e). Regarding the ineffective assistance of counsel claims contained in claims (a), (b), (c), (d), and (f), we conclude that Johnson’s claims are refuted by the record. Accordingly, we affirm the postconviction court’s summary denial of the claims.
In claim (a), Johnson argues that his counsel was deficient in failing to object to the State’s argument that Johnson had sexually battered White. Johnson contends that the State’s argument was based on hair and fiber evidence that was not introduced at trial and on inflammatory photographs of White’s anal and vaginal region. The record establishes, however, that although the actual hairs and fibers relied on by the State in closing argument *1030 were not introduced as evidence,[3] both federal and state investigators testified that hairs and fibers found on White’s body were consistent with those belonging to Johnson. The State is permitted to argue at closing based on the evidence presented at trial, including the testimony of witnesses. See Miller v. State, 926 So.2d 1243, 1254-55 (Fla.2006) (holding that an attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses). Johnson’s trial counsel was not deficient for failing to object to proper argument. See id. at 1255. Moreover, counsel did object when the “inflammatory” photographs of White were introduced at trial, but the trial court overruled counsel’s objection. Counsel was therefore neither deficient in failing to object to the photographs nor deficient in failing to object to the State’s reference to the photographs during closing argument. See id.
Claim (b) also concerns hair evidence retrieved from White’s body. Johnson argues that his counsel was deficient for failing to object when — at the suppression hearing — the State argued that two of the hairs were identified as Johnson’s based on a report from the Florida Department of Law Enforcement (FDLE), even though the State was aware that a report from the FBI concluded that the same hairs did not belong to Johnson. Johnson fails to recognize, however, that the State’s argument at the suppression hearing was intended to demonstrate that probable cause had existed at the time the arrest and search warrants were issued. The FBI analysis was not completed until after the warrants were issued. The State was not incorrect in arguing that the FDLE report — which was completed prior to the warrants being issued — was relevant to establish probable cause while omitting any reference to the subsequently released FBI report. Johnson’s trial counsel was therefore not deficient for failing to object to the State’s argument. See Owen v. State, 986 So.2d 534, 551 (Fla.2008) (holding counsel is not ineffective for failing to object to comments that are not improper).
For the same reason, Johnson has not established deficient performance in claim (c), which asserts that the State presented inconsistent arguments regarding the conflicting FDLE and FBI reports. Johnson argues that his counsel was ineffective in failing to object when, at trial, the State argued that the conflicting evidence contained in the FDLE and FBI reports did not conclusively establish or exclude Johnson as White’s murderer, despite having relied on the FDLE results during the suppression hearing. Because the State’s argument at the suppression hearing was not directed at establishing Johnson’s guilt, any argument by the State at trial regarding the weight of the contradictory analyses does not constitute a theory of prosecution inconsistent with the State’s suppression hearing argument. Johnson’s trial counsel was not deficient for failing to object to argument that was not improper. See id.
We also reject Johnson’s ineffective assistance claim in claim (d), in which Johnson claims that his trial counsel *1031 was ineffective in failing to introduce evidence of his “actual innocence” of the White murder. Appellant’s Initial Brief at 95. Specifically, Johnson argues that counsel was deficient for not presenting evidence of the fact that Johnson was a chronic nail biter. Johnson contends that such evidence would have conclusively proven his innocence in light of the State’s evidence that White’s murderer had caused injuries to White’s anal and vaginal regions with his fingernails. The record, however, establishes that the medical examiner could not completely exclude the possibility that the injuries to White’s anal and vaginal regions were caused by something other than the murderer’s fingernails. Because the record refutes Johnson’s claim that this evidence conclusively established Johnson’s “actual innocence,” the postconviction court properly summarily denied Johnson’s claim. Moreover, in light of the abundance of evidence of Johnson’s guilt, including a valid taped confession and Johnson’s fingerprints recovered from the crime scene, Johnson’s eoncluso-ry assertion that “the result of the trial would have been different,” Appellant’s Initial Brief at 96, absent trial counsel’s alleged error does not satisfy the prejudice prong of Strickland. Jones, 998 So.2d at 584 (“A mere conclusory allegation that the outcome would have been different is insufficient to state a claim of prejudice under Strickland; the defendant must demonstrate how, if counsel had acted otherwise, a reasonable probability exists that the outcome would have been different.”).
Finally, we deny Johnson’s ineffective assistance claim presented in claim (f), in which Johnson argues that a key piece of evidence supporting the search warrant — an affidavit by Virgina Casey, the technician who positively matched fingerprints taken from the White crime scene to Johnson’s prints on record — was unsworn and contained false information. Specifically, Johnson argues that Casey testified that she did not swear to her affidavit and that, although Casey’s affidavit stated that technician Madelyn Luzier had verified the results of Casey’s fingerprint comparison, Luzier testified that she had no involvement with the fingerprints after she collected them. Because Casey’s affidavit was incorporated into the affidavit accompanying the search warrant, Johnson claims that the search warrant was invalid. Johnson argues that his trial counsel was ineffective in failing to raise this argument at the suppression hearing and that, but for counsel’s error, the trial court would have suppressed the evidence obtained pursuant to the search warrant. Johnson’s claim is without merit.
Insofar as Johnson claims that the search warrant was invalid because Casey’s affidavit was unsworn, Johnson’s claim fails. Casey’s affidavit did not accompany the search warrant. Instead, the accompanying affidavit briefly recounted the facts surrounding Casey’s identification of the prints found on White’s window sill as belonging to Johnson. The accompanying affidavit does not claim to incorporate sworn statements from Casey’s affidavit, and Johnson does not allege that the accompanying affidavit was unsworn.
Moreover, to the extent Johnson alleges that information contained in the accompanying affidavit was false, his claim is refuted by the record. In summarily denying this claim, the postconviction court included the transcript from a deposition in which Luzier testified that she looked at and agreed with Casey’s print comparison. Although Luzier testified that she did not personally perform the comparison, the record confirms the accompanying affidavit’s claim that Luzier verified the result of Casey’s comparison. Because counsel cannot be deemed deficient for failing to pur *1032 sue a meritless claim, Johnson has not shown that his counsel was deficient in failing to challenge the search warrant on these grounds. See Lukehart, 70 So.3d at 518. And because counsel’s alleged error does not undermine confidence in the outcome of the suppression hearing, Johnson cannot establish that he was prejudiced by such error. See Porter, 130 S.Ct. at 455.
IV. CONCLUSION
For the reasons stated above, we conclude that Johnson is not entitled to post-conviction relief from his conviction and sentence for the first-degree murder of Iris White. Accordingly, we affirm the circuit court’s denial of Johnson’s motion for postconviction relief.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.
QUINCE, J., recused.

. See, e.g., Johnson v. State, No. SC78,336 (Fla. order filed Jun. 4, 1997) (unpublished order tolling time for filing of Johnson’s amended motion due to financial condition of Office of the Capital Collateral Representative); In re Amendments to Fla. Rule Crim. Pro. 3.852, 700 So.2d 680, 681 (Fla. 1997) (tolling time for filing Johnson’s postconviction motion for ninety days to allow collateral counsel to transition from a single office to three regional offices); Amendments to Fla. Rules Crim. Pro. 3.851 & 3.850, 719 So.2d 869, 871-72 (Fla.1998) (tolling time for Johnson to file motion under rule 3.850 or 3.851 until October 1, 1998, based on insufficient funding of collateral counsel); and State v. Johnson, Nos. 88 CF 3200, et al. (Fla. 12th Cir. Ct. order filed Feb. 13, 2002) (extending date for filing of Johnson's amended motion to March 4, 2002).

. Johnson’s amended rule 3.850 motion is governed by the requirements applicable to rule 3.850, rather than Florida Rule of Criminal Procedure 3.851, because his amended motion relates back to his original motion, which was filed before October 1, 2001, the effective date of rule 3.851. See Franqui, 59 So.3d at 95 n. 13.

. To the extent Johnson argues that his counsel should have objected to testimony based on hairs and fibers never introduced as evidence, Johnson’s claim fails. Those individuals testifying regarding the hair and fiber evidence were expert witnesses and were therefore permitted to rely on facts that were not admitted at trial as long as such facts are "of a type reasonably relied upon by experts in the subject to support the opinion expressed.” Linn v. Fossum, 946 So.2d 1032, 1036 (Fla.2006) (quoting § 90.704, Fla. Stat. (2005)).